# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE ___JUL 2 5 2013___

_____
_for_ CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on July 25, 2013

Ronald R. Carpenter
Supreme Court Clerk



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 87376-3 |
| Respondent, | ) | |
| | ) | EN BANC |
| v. | ) | |
| | ) | Filed: JUL 2 5 2013 |
| MICHAEL ALLEN CLARK, | ) | |
| Petitioner. | ) | |

FAIRHURST, J.—This case presents a question about the State's ability to search tribal trust land for a crime committed on a reservation over which the State has jurisdiction. While the State lacks explicit statutory authorization to issue search warrants for tribal lands, federal law has not preempted the State's ability to do so, and the Confederated Tribes of the Colville Reservation (Colville Tribes) had not, at the time of this search, utilized their inherent sovereignty to regulate the manner in which state agents could execute state search warrants on the Colville Indian Reservation. This absence of preemption or tribal regulation allowed the State to search Michael Allen Clark's property. Consequently, we affirm Clark's

1

conviction for theft because the trial court properly denied his motion to suppress evidence gathered on tribal trust land without a tribal warrant.

I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 13, 2009, a break-in occurred at a facility owned by the Cascade and Columbia River Railroad (CCRR). The facility sits on fee land within both the city of Omak and the Colville Indian Reservation.

An Omak detective later arrested Clark, an enrolled member of the Colville Tribes, at his home for a different crime. Clark resided on tribal trust land also located within both the city of Omak and the Colville Indian Reservation. Based on information gathered at the scene of this arrest, the detective sought a search warrant for Clark's residence to look for evidence related to the CCRR break-in.[1] Though attempting to search tribal trust land, the detective sought the warrant from the Okanogan County District Court (OCDC) instead of the Colville Tribal Court or the United States District Court for the Eastern District of Washington. The OCDC issued the search warrant and police seized evidence related to the break-in. The State charged Clark with burglary in the second degree, theft in the first degree, and malicious mischief in the third degree.

---

[1]Clark does not assign error to the determination that probable cause supported the decision to issue the warrant to search his residence.

Clark moved to suppress the seized evidence, arguing that the Colville Tribal Court had jurisdiction over his property, not the OCDC, rendering the warrant and search invalid. The trial court denied this motion.

The jury convicted Clark only of theft in the first degree. Clark appealed, assigning error to the trial court's denial of his motion to suppress.[2] The Court of Appeals, Division Three, rejected Clark's claim in a published opinion. *State v. Clark*, 167 Wn. App. 667, 274 P.3d 1058 (2012).

Clark petitioned for review, which we granted. *State v. Clark*, 175 Wn.2d 1005, 285 P.3d 885 (2012). In addition to briefing from the parties, we have received amicus briefs from the Washington Association of Prosecuting Attorneys, the American Civil Liberties Union of Washington, and the Colville Tribes.

## II. ISSUES PRESENTED

Does the State's jurisdiction over crimes committed on fee land within an Indian reservation allow it to issue and execute a valid state search warrant for tribal trust property?

## III. ANALYSIS

Clark argues that the trial court erred by denying his motion to suppress the evidence that police gathered at his residence. He contends that the tribal court had

---

[2]Clark also assigned error to the trial court's refusal to reconfigure the jury to include members of the Colville Tribes living on the Colville Indian Reservation. The Court of Appeals rejected this argument, *State v. Clark*, 167 Wn. App. 667, 673-75, 274 P.3d 1058 (2012), and we denied review of this issue.

jurisdiction over his property and therefore the State could not authorize or execute the search without obtaining, or attempting to obtain, the permission of the tribal court. Suppl. Br. of Pet'r at 2.

A warrant issued without authority is inherently void and cannot authorize a search. *Bosteder v. City of Renton*, 155 Wn.2d 18, 29, 117 P.3d 316 (2005), *superseded by statute on other grounds*, *Wright v. Terrell*, 162 Wn.2d 192, 170 P.3d 570 (2007). Generally, a search conducted without authorization by a warrant violates the Fourth Amendment to the United States Constitution.[3,4] *State v. Garcia-Salgado*, 170 Wn.2d 176, 184, 240 P.3d 153 (2010). The remedy for a Fourth Amendment violation is the exclusion of the illegally obtained evidence. *State v. Eserjose*, 171 Wn.2d 907, 913 n.5, 259 P.3d 172 (2011).

Washington's statutory authority over reservation lands derives from a federal delegation of jurisdiction. Pub. L. No. 83-280, 67 Stat. 588 (1953) (hereinafter PL-280); *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 470-71, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979).

---

[3]Clark does not specify the constitutional basis for his argument. We presume he claims the search violated the Fourth Amendment to the United States Constitution due to his references to the "Constitution" and federal search and seizure cases. Suppl. Br. of Pet'r at 2.

[4]The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

4

Washington accepted only a limited portion of the jurisdiction offered by Congress,

> obligat[ing] and bind[ing] itself to assume criminal and civil jurisdiction over Indians and Indian territory, reservations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States, unless the provisions of RCW 37.12.021 have been invoked, except for the following:
>
> > (1) Compulsory school attendance;
> > (2) Public assistance;
> > (3) Domestic relations;
> > (4) Mental illness;
> > (5) Juvenile delinquency;
> > (6) Adoption proceedings;
> > (7) Dependent children; and
> > (8) Operation of motor vehicles upon the public streets, alleys,
>
> roads, and highways: PROVIDED FURTHER, That Indian tribes that petitioned for, were granted and became subject to state jurisdiction pursuant to this chapter on or before March 13, 1963 shall remain subject to state civil and criminal jurisdiction as if chapter 36, Laws of 1963 had not been enacted.

RCW 37.12.010 (reviser's note omitted).

Under RCW 37.12.010, the State has jurisdiction over crimes committed on fee lands within the borders of a reservation or on trust or allotment lands outside a reservation's borders. *State v. Pierre*, 66 Wn.2d 703, 704, 404 P.2d 788 (1965); *State v. Cooper*, 130 Wn.2d 770, 775-76, 928 P.2d 406 (1996). The State lacks jurisdiction over crimes committed on trust or allotment land within reservation

5

borders. RCW 37.12.010. The CCRR theft occurred on fee land within the reservation's borders; consequently, RCW 37.12.010 provides the State with jurisdiction over Clark's crime.

While RCW 37.12.010 provides the State with criminal jurisdiction over the CCRR break-in, it does not explicitly authorize the State to issue and execute a search warrant for tribal trust land pursuant to this jurisdiction. *See id.* (no explicit provision allowing state courts to issue search warrants for tribal lands to investigate crimes for which the State has jurisdiction); *State v. Matthews*, 133 Idaho 300, 986 P.2d 323, 335 (1999) (reasoning that a similar, limited assumption of jurisdiction under PL-280 did not provide Idaho with the explicit statutory power to authorize searches of Indian country for crimes over which it had criminal jurisdiction).

However, the absence of explicit statutory authorization does not mean that the OCDC lacked the authority to issue a search warrant for trust property or that the Omak police lacked the authority to execute this warrant. The State may exert its authority on reservation lands, even without statutory authorization, subject to certain limitations. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980); *Powell v. Farris*, 94 Wn.2d 782, 785-87, 620 P.2d 525 (1980). First, Congress' plenary power over tribal affairs allows it to preempt the application of state law to tribal members or tribal lands. *Bracker*, 448

U.S. at 142; *McClanahan v. State Tax Comm'n*, 411 U.S. 164, 172, 93 S. Ct. 1257, 36 L. Ed. 2d 129 (1973). Second, tribal sovereignty may also prevent the exertion of state authority in Indian country. *Bracker*, 448 U.S. at 142 (citing *United States v. Mazurie*, 419 U.S. 544, 557, 95 S. Ct. 710, 42 L. Ed. 2d 706 (1975)). Because of this sovereignty, states may exert their authority over reservation lands only where doing so does not undermine tribal self-governance by "infring[ing] 'on the right of reservation Indians to make their own laws and be ruled by them.'" *McClanahan*, 411 U.S. at 179 (quoting *Williams v. Lee*, 358 U.S. 217, 220, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959)); *Powell*, 94 Wn.2d at 786-87.

The first limitation, federal preemption, poses no barrier to the State's ability to serve criminal process on a suspect or defendant on reservation lands. No federal statute bars the State from doing so. *Matthews*, 986 P.2d at 337. Further, we cannot say that Congress has shown any intent to prevent the states from serving criminal process on reservations given PL-280's intent to devolve law enforcement duties from the federal government to the states. *Yakima Indian Nation*, 439 U.S. at 498.

However, Clark's appeal does implicate the second limitation on the State's ability to exert its authority on reservation lands: tribal sovereignty. "[T]he principle that Indians have the right to make their own laws and be governed by them requires 'an accommodation between the interests of the Tribes and the

Federal Government, on the one hand, and those of the State, on the other.'" *Nevada v. Hicks*, 533 U.S. 353, 362, 121 S. Ct. 2304, 150 L. Ed. 2d 398 (2001) (quoting *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 156, 100 S. Ct. 2069, 65 L. Ed. 2d 10 (1980)). In the context of a state's execution of criminal process on reservation lands, this accommodation requires consideration of the jurisdiction associated with the location of the criminal act and any governing tribal criminal procedures. *Id.* at 361-65; *Matthews*, 986 P.2d at 337.

The Supreme Court considered whether tribal sovereignty can prevent the execution of state criminal process for suspected off-reservation crimes in *Hicks*. The dispute in *Hicks* arose after Nevada game wardens searched Hicks' tribal allotment land within the borders of the Fallon Paiute-Shoshone Reservation. *Nevada v. Hicks*, 196 F.3d 1020, 1022 (9th Cir. 1999). Hicks was an enrolled member of the tribe. *Id.* The searches were part of an investigation into alleged poaching occurring off the Fallon Paiute-Shoshone Reservation. *Hicks*, 533 U.S. at 356. The game wardens obtained state and tribal warrants and served the warrants in the presence of tribal officers. *Hicks*, 196 F.3d at 1022-23. Hicks sued the state of Nevada, the game wardens, the tribal court judge, and other tribal members in tribal court for damages inflicted on his property during the searches. *Hicks*, 533

8

U.S. at 356. Nevada and the game wardens sought a judgment declaring that the tribal court lacked jurisdiction. *Id.* at 357.

The Supreme Court framed the issue before it as "whether a tribal court may assert jurisdiction over civil claims against state officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation." *Id.* at 355. The Court answered this jurisdictional question by looking to whether inherent tribal sovereignty allowed the tribe to regulate Nevada officials serving state criminal process or whether federal law preempted Nevada's ability to do so. *Id.* at 357-58. The Court determined that neither tribal sovereignty nor federal law prevented the State from serving criminal process for an off-reservation crime after examining its precedent, the interests involved, and federal law governing jurisdiction on Indian reservations. *Id.* at 360-66.

The parties and supporting amicus curiae disagree as to the applicability of *Hicks* to Clark's appeal. The State and its supporting amicus curiae contend that *Hicks* controls Clark's appeal. Clark and his supporting amicus curiae dismiss the discussion of the execution of criminal process in *Hicks* as inapposite for several reasons.

Clark and his supporting amicus curiae first argue that the portion of *Hicks* concerning the State's ability to execute criminal process on reservation lands is

dictum. This is incorrect. Because the *Hicks* Court relied on its discussion of tribal sovereignty and federal preemption to reach its holding, this portion of *Hicks* is binding law. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). Recognizing this, we have already cited *Hicks* approvingly when affirming the State's ability to exert its authority on a tribal member living on reservation lands for an off-reservation crime. *State v. Cayenne*, 165 Wn.2d 10, 14-15, 195 P.3d 521 (2008) (affirming the State's ability to place sentencing conditions on an Indian living on reservation lands for an off-reservation crime).

Clark and his supporting amicus curiae also maintain that *Hicks'* discussion of the State's ability to search reservation lands is dictum because it does not speak for the Court. This is incorrect as well. Six members of the Court signed the majority opinion in full; none of these justices withheld their signatures from part II, the portion discussing the execution of the search warrants. *Hicks*, 533 U.S. at 354. While Justice Souter filed a concurring opinion signed by Justices Kennedy and Thomas, these justices signed the majority opinion, and their concurrence explicitly stated their agreement "with the Court's analysis as well as its conclusion." *Id.* at 375 (Souter, J., concurring). Justice Ginsburg, who also signed the majority, authored a concurrence as well. *Id.* at 386 (Ginsburg, J., concurring).

Her concurrence merely noted some of the issues left open by *Hicks*, none of which is relevant to Clark's appeal. *See id.* (Ginsburg, J., concurring).

Clark and his amicus curiae next contend that *Hicks* is distinguishable for two reasons. First, they claim that *Hicks* presented the Court with a question about extensions of tribal, not state, power. They therefore argue that it does not govern Clark's appeal, which concerns the State's ability to extend its authority within a reservation. Some courts have distinguished *Hicks* in this fashion. *See, e.g., South Dakota v. Cummings*, 2004 SD 56, 679 N.W.2d 484, 487-89 (2004). But, by approving of *Hicks*' reasoning in *Cayenne*, we have implicitly rejected the argument that we may distinguish *Hicks* in this way.

Finally, Clark and amicus curiae assert that *Hicks* is distinguishable because the Nevada game wardens sought tribal permission to execute the warrants. However, the *Hicks* Court rejected any attempt to require tribal permission, referring to tribal warrants as "unnecessary." 533 U.S. at 372. Clark's argument attaches constitutional significance to attempting to obtain a warrant, but asking permission to search is irrelevant to the Fourth Amendment: either a warrant is required or it is not. In any event, Clark appears to concede that the State could have executed the warrant even if the Colville Tribes refused to grant a tribal warrant by arguing that the State needed to at least attempt to obtain tribal permission. Executing the state warrant on the reservation after the Colville Tribes

refused to consent would surely offend the Colville Tribes' sovereignty more than searching without first seeking a tribal warrant.

While we reject Clark's attempt to distinguish *Hicks* in the manner described above, we do believe his case is distinguishable from *Hicks* and *Cayenne*. Clark's crime occurred on the Colville Reservation; the suspected crime in *Hicks* and the crime in *Cayenne* occurred off-reservation. This is significant because, unlike crimes committed off-reservation, the State does not have exclusive jurisdiction over crimes by Indians occurring on their reservations. "Indian tribes retain 'attributes of sovereignty over both their members and their territory.'" *Bracker*, 448 U.S. at 142 (quoting *Mazurie*, 419 U.S. 544 at 557). PL-280 did not divest tribes of this sovereignty when delegating federal jurisdiction to the states. *State v. Schmuck*, 121 Wn.2d 373, 393-96, 850 P.2d 1332 (1993). Tribal sovereignty provides a tribe with concurrent jurisdiction to punish its members for violations of tribal law occurring on the tribe's reservation. *Id.* at 395 (citing *Walker v. Rushing*, 898 F.2d 672, 675 (8th Cir. 1990)). Clark is an enrolled member of the Colville Tribes. His crime occurred on the Colville Indian Reservation, and the Colville Tribal Code criminalizes theft.[5] The Colville Tribes and the State share concurrent criminal jurisdiction. The shared criminal jurisdiction requires that the

---

[5] "Any person who shall take the property of another person with intent to steal shall be guilty of Theft." Colville Tribal Code 3-1-55, *available at* http://www.colvilletribes.com/3_1_criminal_code.php (last visited July 11, 2013).

accommodation between the interests of the State and the Colville Tribes take a different form than the accommodation found in *Hicks* and *Cayenne*.

Clark asks us to recognize the Colville Tribes' interest by adopting the test used by the Supreme Court of Idaho in *Matthews*, which measures the infringement of tribal sovereignty by looking to whether the State ignored governing tribal procedures while serving criminal process. If the State did so, then under *Matthews* the State undermined tribal self-government. The material facts of *Matthews* are quite similar to those of *Hicks*: state police searched tribal property for an off-reservation crime. *Hicks'* holding has superseded *Matthews* for this particular factual scenario. However, we agree that *Matthews* serves as the starting point for searches of reservation lands where *Hicks* is distinguishable, such as where the crime occurs on reservation land over which the State has jurisdiction. Consequently, we hold that the State does not infringe tribal sovereignty by searching reservation lands unless it disregards tribal procedures governing the execution of state criminal process.[6]

Clark argues that the State ignored a tribal provision governing the execution of search warrants, thus infringing on the Colville Tribes' sovereignty. He points to

---

[6]Our holding is based upon accommodating the interests of the Colville Tribes with those of the State. We have factored the Colville Tribes' statement that they have a strong interest in ensuring that those who violate state law are punished into this accommodation. If the Colville Tribes regulate the execution of state criminal process in a manner that meaningfully frustrates the State's ability to punish those who break the law, a different accommodation will be required.

13

a provision in the tribal code allowing the tribal court to issue search warrants and contends the State's failure to utilize the provision undermined tribal self-governance.[7] However, no infringement of tribal sovereignty occurs unless the tribal procedure governs the execution of state search warrants for crimes over which the State has jurisdiction. *Matthews*, 986 P.2d at 337. The Colville Tribes have offered a procedure that allows the State to obtain a tribal warrant in addition to a state warrant. The provision does not govern the way the State executes its own process. Indeed, the tribal warrant provision does not guarantee that the State could execute its warrant as the tribal court could refuse to issue a tribal warrant. Such refusal would meaningfully impair the State's ability to vindicate its criminal interests and thus be inconsistent with the necessary accommodation between state and tribal interests.

Clark also points to a provision in the tribal code requiring tribal judicial officers to cooperate with federal, state, county, and municipal officers, arguing that the State violated the Colville Tribes' sovereignty by failing to utilize the

---

[7]The tribal code provides:
Every judge of the Court shall have authority to issue warrants for search and seizure of the premises and property of any person under the jurisdiction of the Court. However, no warrant of search and seizure shall be issued except upon a presentation of a written or oral complaint based upon probable cause, supported by oath or affirmation and charging the commission of an offense against the Tribes. No warrant for search and seizure shall be valid unless it contains the name or description of the person or property to be searched and seized and bears the signature of a judge of competent jurisdiction. Service of warrants of search and seizure shall be made by an officer.
Former Colville Tribal Code 2-1-35 (code in effect Oct. 13, 2009).

14

provision to obtain tribal permission to search.[8] This provision also does not regulate the State's ability to execute a warrant on tribal lands as it provides no limits on, or guidance or procedures for, executing state warrants. Again, because this provision did not regulate the State's ability to execute its warrant, the State did not infringe the Colville Tribes' sovereignty with the search.[9]

## IV.   CONCLUSION

The State did not infringe the Colville Tribes' sovereignty by issuing and executing a state warrant on Clark's residence on tribal trust land within the borders of the Colville Indian Reservation because the Colville Tribes had not exercised their sovereignty to regulate the State's ability to execute its process at the time of the search. Because neither tribal sovereignty nor federal preemption inhibited the State's ability to issue and serve the warrant, the State could validly search Clark's property. The trial court properly denied Clark's motion to suppress the evidence gathered through the search. We therefore affirm Clark's conviction for theft in the first degree.

---

[8] "All judges and personnel of the Tribal Court shall cooperate with all branches of the [Bureau of Indian Affairs], with all federal, state, county and municipal agencies, when such cooperation is consistent with this Code, but shall ever bear in mind that their primary responsibility is to the people of the Tribes." Colville Tribal Code § 1-1-102, *available at* http://www.colvilletribes.com/updatedcode.php (last visited July 11, 2013).

[9] Clark does not argue that any treaty provision creates governing procedures for executing a state search warrant on the Colville Indian Reservation. We do not foreclose the possibility that the State would infringe tribal sovereignty by disregarding governing procedures created by such provisions with our opinion today. *See State ex rel. Merrill v. Turtle*, 413 F.2d 683, 686 (9th Cir. 1969).

Fairhurst, J.

WE CONCUR:

Madsen, C.J.

Stephens, J.

Wiggins, J.

González, J.